*State of New York*
*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered:  August 13, 2015                    520239
_____

In the Matter of RENSSELAER
    COUNTY SHERIFF'S DEPARTMENT,
                    Petitioner,

            v                          MEMORANDUM AND JUDGMENT

NEW YORK STATE DIVISION OF
    HUMAN RIGHTS et al.,
                    Respondents.
_____

Calendar Date:   June 3, 2015

Before:   Peters, P.J., McCarthy, Egan Jr. and Rose, JJ.

                    _____

        Napierski, VanDenburgh, Napierski & O'Connor, LLP, Albany
(Shawn F. Brousseau of counsel), for petitioner.

        Caroline Downey, State Division of Human Rights, New York
City (Michael K. Swirsky of counsel), for New York State Division
of Human Rights, respondent.

        Luibrand Law Firm, PLLC, Latham (Peter J. Moschetti Jr. of
Anderson, Moschetti & Taffany, PLLC, Latham, of counsel), for
Lora Abbott Seabury, respondent.

                    _____

McCarthy, J.

        Proceeding pursuant to Executive Law § 298 (transferred to
this Court by order of the Supreme Court, entered in Rensselaer
County) to, among other things, review a determination of the
Commissioner of Human Rights which, among other things, found
petitioner guilty of an unlawful discriminatory practice based on
gender.

Respondent Lora Abbott Seabury filed a complaint with respondent State Division of Human Rights (hereinafter SDHR) in September 2010, alleging that, while employed by petitioner at its correctional facility, she was subjected to, among other things, sexual harassment by male coworkers. Ultimately, an Administrative Law Judge (hereinafter ALJ), after holding a hearing, found that Seabury had shown that she was sexually harassed by male coworkers and recommended that petitioner be ordered to pay Seabury nearly $450,000 in economic damages and $300,000 in noneconomic damages. The Commissioner of Human Rights adjusted the amount of economic damages to approximately $315,000, but otherwise adopted the ALJ's recommendations in all pertinent respects. Petitioner thereafter initiated this proceeding to annul the Commissioner's final determination. Seabury filed an application seeking modification and confirmation of the final determination. The consolidated proceeding was transferred by Supreme Court to this Court.

When reviewing a determination made by the Commissioner in a matter such as this one, our purview is "extremely narrow" and must focus not on whether we would have reached the same result as did the Commissioner, but instead on whether the Commissioner's determination was rational in light of the evidence presented (Matter of State Div. of Human Rights [Granelle], 70 NY2d 100, 106 [1987]; accord Matter of Arcuri v Kirkland, 113 AD3d 912, 914 [2014]; Matter of West Taghkanic Diner II, Inc. v New York State Div. of Human Rights, 105 AD3d 1106, 1107 [2013]). Such deference is due given SDHR's expertise in evaluating discrimination claims (see Matter of Arcuri v Kirkland, 113 AD3d at 914; Matter of Harrison v Chestnut Donuts, Inc., 60 AD3d 1130, 1131 [2009]). A violation of Executive Law § 296 based on a hostile work environment must be supported by proof that the "workplace [was so] permeated [by a] discriminatory" atmosphere that it "alter[ed] the conditions of the [complainant's] employment" (Forrest v Jewish Guild for the Blind, 3 NY3d 295, 310 [2004] [internal quotation marks and citation omitted]; accord Matter of West Taghkanic Diner II, Inc. v New York State Div. of Human Rights, 105 AD3d at 1107). "Where, as here, there is a finding of a hostile work environment as a result of sexual harassment, the evidence in the record must

establish the pertinent elements, including proof that the discriminatory conduct occurred due to the complainant's gender" (Matter of Arcuri v Kirkland, 113 AD3d at 914; see Suriel v Dominican Republic Educ. & Mentoring Project, Inc., 85 AD3d 1464, 1466 [2011]).

According to Seabury, after reporting coworker Richard Fenton for offenses that included sleeping on the job and previously grabbing her buttocks and breasts without her consent, Seabury began to be increasingly harassed by male friends of Fenton, who had been suspended as a result of the initial reports. Seabury testified that this group of men, along with Fenton, were known by the name "the boys club" within the correctional facility. Seabury further testified that one of her supervisors, Captain Hal Smith, also referred to the group of men by that phrase. According to Seabury, members of the boys club began to level slurs at both Seabury and another female employee who had reported Fenton for sexual harassment, slurs that included rat, bitch, slut and whore. The men also began making rat noises while in the presence of the two female employees. According to Seabury, one such male employee stated, "That f***ing bitch don't miss a f***ing trick" in reference to Seabury and while in her presence. Seabury explained that this harassment occurred on a daily basis and that she always reported the incidents to Smith.[1] Seabury testified that Smith would tell her, "be tough" and "[y]ou need to be strong," but failed to reprimand the offending employees. Seabury also testified that Smith communicated that he held different professional expectations for the alleged male harrasers than for Seabury, informing her that "boys will be boys" and "you know how those

---

[1] Petitioner's sexual harassment policy directs employees to bring complaints "to a supervisor of [the employee's] choice," with permissible methods of notification, including "requesting an individual interview" with that supervisor. Given that Seabury complied with this policy by reporting the alleged harassment to Smith, we need not decide the question of whether the lack of an employee's compliance with such reporting policy would offer a defense to liability (see generally Forrest v Jewish Guild for the Blind, 3 NY3d at 312 n 10).

boys are." When Seabury specifically reported to Smith that she believed that the fellow female employee who had also reported Fenton had been assigned, by one of the individuals in the boys club,[2] to a stressful, undesirable and potentially more dangerous shift as a form of harassment, Smith suggested that Seabury go speak to the employee who had made the assignment. Seabury clarified that the same employee had also been harassing her and then asked Smith if he still thought she should go speak to him. He responded, "That's how you approach it" and explained that it was "nice" of that employee to prepare the schedule. According to Seabury, she printed explanations of illegal workplace harassment from the Internet and provided them to Smith. Such prompting was to no avail, however, as Smith did not reprimand the offending male employees.

Seabury further testified that, despite this daily harassment, she planned on continuing to work and to reach her retirement. Seabury explained that she wanted to be the first female sergeant to retire from the correctional facility, and additional evidence established that Seabury had worked in excess of 17 years, more than two-thirds the number of years necessary to receive a pension based on 25 years of service. She elaborated that another female sergeant previously had worked at the facility but had not reached retirement. Without specifically identifying the alleged culprits, Seabury testified that employees would make known their plans to cause that female sergeant to cry during her shift. Seabury explained that these unidentified employees continued such harassing behavior until that female sergeant quit. Seabury further explained that, notwithstanding her retirement goal, the harassment she suffered,

_____

[2] In this and other portions of the record, Seabury's testimony umambiguously establishes that she identified such harassers, by name, to Smith. Such evidence contradicts petitioner's assertion that Seabury failed to identify the specific men who were harassing her. Given that the record does not support petitioner's factual contention, we need not address the plausibility of petitioner's related argument that any inaction on Smith's part is attributable to Seabury's nonspecific reports.

which was not ameliorated despite her daily reports to her supervisor, eventually caused her to leave her employment.

Considering the evidence presented at the hearing, there is a rational basis for the determination that, but for Seabury's gender, she would not have suffered the harassment that she described and that such harassment altered the conditions of her employment so as to create an abusive work environment. Notably, the ALJ credited Seabury's testimony, and this Court will defer to that determination (see Matter of Arcuri v Kirkland, 113 AD3d at 914; Matter of West Taghkanic Diner II, Inc. v New York State Div. of Human Rights, 105 AD3d at 1108). Relying on that credited testimony, the proof established that the persons harassing Seabury were all male members of a group of friends and coworkers who were identified, as a group, by their gender. In addition, many of the slurs leveled at Seabury and the other female who reported Fenton's sexual harassment invoked the victims' gender (compare Matter of Grand Union Co. v Mercado, 263 AD2d 923, 924-925 [1999]). Further, a reasonable person could conclude that Smith indicated to Seabury that he held different expectations for male and female employees and that women employees were required to be strong and tough while male employees were permitted to "be boys," without any reprimand. At a minimum, such statements by Smith and his lack of corrective action condoned such conduct (see Matter of New York State Dept. of Correctional Servs. v New York State Div. of Human Rights, 53 AD3d 823, 825 [2008]), and there is a rational inference that Smith's directive to Seabury, his inferior, that she should confront one of the offenders regarding his gender-based harassment of another female employee effectively encouraged the harassment that Seabury suffered (see generally Matter of State Div. of Human Rights v St. Elizabeth's Hosp., 66 NY2d 684, 687 [1985]). Accordingly, the Commissioner's determination was rational in light of the evidence presented (see Matter of West Taghkanic Diner II, Inc. v New York State Div. of Human Rights, 105 AD3d at 1107; Matter of New York State Dept. of Correctional Servs. v New York State Div. of Human Rights, 53 AD3d at 825; Matter of R & B Autobody & Radiator, Inc. v New York State Div. of Human Rights, 31 AD3d 989, 990-991 [2006]; Matter of Grand Union Co. v Mercado, 263 AD2d at 924).

We will not reduce Seabury's $300,000 award for noneconomic injuries. An award for noneconomic damages will be upheld where it is reasonably related to the wrongdoing, supported by substantial evidence and comparable to other awards for similar injuries (see Matter of Freudenthal v County of Nassau, 99 NY2d 285, 291 [2003]; Matter of New York City Tr. Auth. v State Div. of Human Rights, 78 NY2d 207, 217 [1991]; Matter of New York State Dept. of Correctional Servs. v New York State Div. of Human Rights, 53 AD3d at 826; Matter of Kondracke v Blue, 277 AD2d 953, 954 [2000]). Seabury testified that the male coworkers' harassment led to extensive psychological trauma that included suicidal ideations and required medication. Seabury's psychiatrist confirmed these reports and testified that he had diagnosed Seabury with posttraumatic stress disorder and major depressive disorder. The psychiatrist opined that the causes of such conditions were Seabury's frequent and recurring thoughts regarding the harassment that she suffered at the correctional facility. Considering Seabury's testimony and the medical proof elaborating on the severe effects that the discrimination had on her, the award is reasonably related to the wrongdoing, supported by substantial evidence and comparable to awards for similar injuries (see Matter of New York State Dept. of Correctional Servs. v New York State Div. of Human Rights, 53 AD3d at 826; Matter of Kondracke v Blue, 277 AD2d at 954; Matter of Town of Hempstead v State Div. of Human Rights, 233 AD2d 451, 454-456 [1996], appeal dismissed 89 NY2d 1029 [1997], lv denied 90 NY2d 807 [1997]; Matter of New York City Tr. Auth. v State Div. of Human Rights, 181 AD2d 891, 895 [1992], lv denied 80 NY2d 762 [1992]).

Next, we agree with Seabury's argument that the Commissioner should not have offset her award based on past and future workers' compensation benefits. Workers' Compensation Law § 29 (1) provides that, when a benefits recipient pursues a legal remedy against a third party with respect to the same injuries for which he or she is receiving benefits, the relevant insurance carrier "shall have a lien on the proceeds of any [resulting] recovery . . . to the extent of the total amount of compensation awarded." One purpose of Workers' Compensation Law § 29 (1) is to "shift the burden of paying compensation from the carrier . . . to the party actually responsible for the injury" (Matter

of Murphy v New York City Police Dept., 270 AD2d 733, 733 [2000]; accord Matter of Beth V. v New York State Off. of Children & Family Servs., 22 NY3d 80, 90 [2013]).  By its unambiguous terms, Workers' Compensation Law § 29 (1) grants a lien without any exception for when an award of damages has already been reduced in recognition of a workers' compensation award.  Accordingly, an interpretation of Workers' Compensation Law § 29 (1) that allowed a reduction in the initial award of damages would not foreclose the plain application of a lien to that already reduced award, which would permit the absurd result of punishing the injured party with a "double debit instead of preventing a double benefit" (Dietrick v Kemper Ins. Co. [American Motorists Ins. Co.], 76 NY2d 248, 252 [1990]).  Therefore, we reject the notion that an award that would be subject to such a lien may be reduced at the outset, because such a scheme is inconsistent with Workers' Compensation Law § 29 (1).  Accordingly, the Commissioner erred as a matter of law by reducing Seabury's award for past lost wages by $88,200 and her award for future lost wages by $176,400 on the basis of workers' compensation benefits.

In addition, we agree with Seabury that the damages should have properly reflected consideration of the pension that she would have received absent the harassment, given that any remedy should "make the victim whole for injuries suffered as a result of discriminatory employment practices" (Matter of Beame v DeLeon, 87 NY2d 289, 297 [1995]), and that we have unambiguously established that such a remedy includes the consideration of "pension rights [that are] established with reasonable certainty" (Lamot v Gondek, 163 AD2d 678, 680 [1990]; see Matter of Laverack & Haines v New York State Div. of Human Rights, 217 AD2d 955, 956 [1995], revd on other grounds 88 NY2d 734 [1996]; see generally Reid v Weir-Metro Ambulance Serv., 191 AD2d 309, 310 [1993]; McWeeney v New York, New Haven & Hartford R.R. Co., 282 F2d 34, 36 [2d Cir 1960], cert denied 364 US 870 [1960]).  However, considering that petitioner bears the sole responsibility of making the complainant whole and could do so by payment commensurate with any damages attributable to loss or diminution of pension (see e.g. Lamot v Gondek, 163 AD2d at 680), the Commissioner's order that petitioner take steps to involve the Office of the State Comptroller and the New York State and Local Retirement System — presumably to have them provide an actual

pension — was an abuse of discretion (see generally Weiss v New York State Human Rights Appeal Bd., 102 AD2d 471, 473 [1984] [holding that Commissioner erred in ordering state employer to provide the promotion to a victim that the victim would have received absent age discrimination instead of providing a proper award of monetary damages]).[3]

Because it attempted to provide Seabury her actual anticipated pension, SDHR never calculated the monetary award that would compensate Seabury for the loss of that expected annuity.[4] Given the absence of an initial determination in that regard, we remit for the limited purpose of resolving the amount of damages that will make Seabury whole to the extent that her pension has been diminished, in whole or in part (see State Div. of Human Rights v New York State Dept. of Correctional Servs., 91 AD2d 832, 833 [1982]; Sears v New York State Div. of Human Rights, 73 AD2d 913, 915 [1980], lv denied 49 NY2d 705 [1980]).

Finally, petitioner did not establish that Seabury failed to mitigate damages relating to her pension to the extent that she failed to obtain a collateral offset in the form of disability retirement benefits (see generally CPLR 4545 [a]). As is relevant here, petitioner bore the burden of establishing its entitlement to a collateral offset — a collateral source payment that particularly corresponds to a category of loss for which

---

[3] Given this conclusion, we need not address the related question of whether the remedy was also unlawful to the extent that the Office of the State Comptroller and the New York State and Local Retirement System had no legal authority to assist in the provision of such a remedy.

[4] Notably, for the purposes of such calculation, Seabury's testimony that she planned to work for 25 years was credited, she provided the relevant portions of her collective bargaining agreement and she provided evidence of her wages for the final three full years of her employment, which allows for the computation of her final average salary (see generally Retirement and Social Security Law § 608).

damages are awarded — by clear and convincing evidence (see Johnson v New York City Tr. Auth., 88 AD3d 321, 328 [2011]; Young v Knickerbocker Arena, 281 AD2d 761, 764 [2001]).  It is uncontested that Seabury has never applied for such benefits (see e.g. Young v Tops Mkts., 283 AD2d 923, 926 [2001]).  Petitioner — in its briefs to the Commissioner and to this Court — broadly asserts that the record establishes that Seabury would have been entitled to disability retirement benefits or performance of duty disability benefits.  Having failed to identify in any meaningful detail which specific statutory provisions it relies upon for the proposition that Seabury is qualified for such benefits, or the further specific provisions that would establish what amount Seabury would receive if she were so entitled, we are unable to say that petitioner met its burden of establishing by clear and convincing evidence that Seabury was obligated to mitigate damages by obtaining a collateral offset (compare Johnson v New York City Tr. Auth., 88 AD3d at 328, with Terranova v New York City Tr. Auth., 49 AD3d 10, 18-20 [2007], lv denied 11 NY3d 708 [2008]).

The remaining issues have been considered and found to be without merit.

Peters, P.J., Egan Jr. and Rose, JJ., concur.

ADJUDGED that the determination is modified, without costs, by (1) increasing the award for past lost wages from $107,558.51 to $195,758.51, (2) increasing the award for future lost wages from $208,837.02 to $385,237.02, and (3) annulling so much thereof as ordered petitioner to work with the Office of the State Comptroller and the New York State and Local Retirement System regarding respondent Lora Abbott Seabury's pension; matter remitted to respondent New York State Division of Human Rights for a determination of damages related to Lora Abbott Seabury's pension; and, as so modified, confirmed.

ENTER:

Robert D. Mayberger
Clerk of the Court